Alan Van Praag
Robert K. Gross
Edward W. Floyd
EATON & VAN WINKLE LLP
3 Park Avenue
New York, New York 10016-2078
(212) 779-9910
avanpraag@evw.com
rgross@evw.com
efloyd@evw.com
*Attorneys for Armada (Singapore) Pte Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------

In re:

**ASHAPURA MINECHEM LTD**

Debtor in a Foreign Proceeding.

--------------------------------------------------------------

Chapter 15

Case No.: 11-14668 (JMP)

## RESPONSE AND LIMITED OBJECTION OF ARMADA (SINGAPORE) PTE LIMITED TO FOREIGN CHAPTER'S 15 PETITIONER'S MOTION FOR A "GAP PERIOD" PRELIMINARY INJUNCTION

1.      Armada (Singapore) Pte Limited ("Armada") submits this Response and Limited Objection to the Motion made by Chetan Shah, as foreign representative of petitioner Ashapura Minechem Ltd. ("Ashapura"), for a preliminary injunction enjoining the commencement or continuation of certain legal proceedings in the United States against Ashapura (or its assets or the proceeds thereof) during the "gap" period that runs prior to the issuance of an order regarding recognition of Ashapura's Indian proceedings under Chapter 15 of the Bankruptcy Code.

2.      Armada is the foreign debtor in another case under Chapter 15 of the Bankruptcy Code in this Court (Case No. 09-10105 [JMP]) in which the court entered an Order of Recognition, dated July 22, 2009.

3.      The actions Ashapura seeks to enjoin include proceedings in a pre-petition action

1

(the "Rule B Action"), commenced on August 31, 2010 in the United States District Court for the Northern District of Illinois (the "District Court"), captioned <u>Armada v. Ashapura</u>, Case No. 10 Civ. 5509, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims ("Rule B") that resulted in (a) an order dated September 2, 2010 attaching, <u>inter alia</u>, any debts of certain non-debtor garnishees to Ashapura during the course of the Rule B Action, (b) the posting of a surety bond (the "Surety Bond") on September, 28, 2010 by Travelers Casualty and Surety Company ("Travelers" or the "Surety") to stand as substitute security for such obligations, and (c) a pre-petition order and judgment, dated September 28, 2011, determining the amount of the Surety's liability under the Surety Bond to be $687,356.52, and directing the non-debtor garnishees who are principals on the Surety Bond to turn over $687,356.52 to Armada as a condition for releasing the bond (the "Pre-Petition Turn Over Order and Judgment").

      4.      Armada seeks a limited carve-out from the gap period injunction sought by Ashapura in this proceeding, allowing Armada to pursue such enforcement proceedings as are available to Armada in the Rule B Action against the Surety Bond, the Surety, and/or the non-debtor garnishees.

      5.      As set forth below, the Surety Bond issued in the Rule B Action manifestly is not property of Ashapura within the meaning of the Bankruptcy Code. Armada's proceeding against the Surety Bond or the Surety would thus not be directed against any property of Ashapura.

      6.      Moreover, as discussed below, the representative of the non-debtor garnishees testified in the Rule B Action that the obligations for which the Surety Bond was posted as substitute security were "satisfied or extinguished" before the District Court issued the Pre-Petition Turn Over Order and Judgment directing the turn-over of $687,356.52 to Armada. In

2

turn, the District Court observed that the testimony before it revealed that $669,151.23 of the amount directed to be turned over to Armada would have simply been kept by the garnishees if not turned over to Armada. Accordingly (as with a recovery by Armada against the Surety or the Surety Bond), Armada's enforcement of the Pre-Petition Turn Over Order and Judgment against the garnishees is, likewise, not directed against property of Ashapura.

## **BACKGROUND FACTS**

7. In April 2008, Armada and Ashapura entered into two long-term, shipping contracts. Disputes arose under the contracts and were submitted to arbitration in London from which two awards issued, in favor of Armada, for over $65 million (the "Awards"). On August 31, 2010, Armada commenced the Rule B Action inter alia, to obtain security for the Awards.[1]

8. On September 2, 2010, Processes of Maritime Attachment and Garnishment ("PMAGs") were issued by the District Court pursuant to Rule B and then served on garnishees, including AMCOL International Corporation ("AMCOL"), Volclay International Corporation ("Volclay") and American Colloid Company ("ACC" and, together with AMCOL and Volclay, the "Garnishees"). Copies of the PMAGs are annexed as Exhibit A.

9. On September 28, 2010, the Garnishees provided, and the District Court approved, a Surety Bond, dated September 17, 2010, as substitute security to permit the release of any Ashapura property that would otherwise have been subject to the PMAGs. Copies of the Surety Bond and the order approving it are annexed hereto, respectively, as Exhibits B and C.

---

[1] Armada had also filed, on June 22, 2010, a petition to confirm the Awards in the United States District Court for the Southern District of New York (in case number 10-4856). On July 29, 2011, judgment was entered in that action, in favor of Armada for over $70 million.

The Surety Bond was executed by Travelers as "Surety," with each of the non-debtor Garnishees as "Principals." (Exhibit B)

10.     Pursuant to the September 28, 2010 Order, and as a result of the Surety Bond being posted by the Garnishees, the District Court vacated the attachment and the Garnishees were free to satisfy whatever debts they owed to Ashapura. In fact, as discussed below, the Garnishees' representative testified in the Rule B Action that they "satisfied" or "extinguished" $669,151.23 of the obligations covered by the Rule B attachment without using funds collected for that purpose. Those funds remaining in the Garnishees' possession after the satisfaction of their obligations to Ashapura constitute all but $18,205 of the monies that District Court directed for turn over by the Garnishees to Armada.

11.     After the issuance of the Surety Bond, discovery was conducted in the Rule B Action with regard to the amount of the property that would have been subject to the attachment but for the Surety Bond. Following such discovery, on May 18, 2011, Armada made a motion in the Rule B Action to recognize, confirm, enter judgment on, and enforce its Awards to the extent of the District Court's *quasi in rem* jurisdiction.

12.     As set forth in an order of the District Court in the Rule B Action, dated July 13, 2011 (a copy of which is annexed as Exhibit D), Armada argued in the Rule B Action that the amount of the property covered by the attachment was $814,657, comprised of three categories of debts that were owed by the Garnishees to Ashapura during the pendency of that action, namely: (i) excess sale proceeds arising from a sale of Ashapura stock made by Volclay, then in the amount of $672,961 (the "Excess Sale Proceeds"); (ii) interest on that amount (the "Interest"); and (iii) open invoices on products purchased from Ashapura in the amount of $18,205 (the "Open Invoices").

4

13.     Ultimately, by an Opinion and Order dated August 29, 2011, and the Pre-Petition Turn Over Order and Judgment, also dated August 29, 2011 (copies of which are annexed as Exhibits E and F, respectively), the District Court in the Rule B Action ruled in Armada's favor, finding that the Rule B attachment and the Surety Bond covered obligations of the Garnishees to pay Excess Sale Proceeds in the amount of $669,151.23 and Open Invoices in the amount of $18,205.29, and ordering that the "Garnishees must turn over $687,356.52" to Armada based upon those amounts. Those rulings established $687,356.52 as the amount of the Surety's liability under the Surety Bond that had been in place since September, 2010, and made the Garnishees directly liable to Armada in that amount. As set forth below, enforcement against the Surety Bond is not subject to a stay under Bankruptcy Law in these circumstances by reason of the fact that no property of Ashapura is involved.

14.     Similarly, Armada's recovery from the Garnishees of $669,151.23 (representing the amount of the Excess Sale Proceeds) under the Pre-Petition Turn Over Order and Judgment in the Rule B Action would not be directed against property of Ashapura, since the Garnishees have testified that they satisfied and extinguished any obligation to pay such amount to Ashapura prior to the entry of the Pre-Petition Turn Over Order and Judgment.

15.     Specifically, as set forth in the August 29, 2011 opinion and order of the District Court in the Rule B Action (Exhibit E, pgs.1-5) a factual dispute in that action concerned whether the Garnishees owed the Excess Sale Proceeds to Ashapura or to Chetan Shah (the foreign representative in this action who, as observed by the District Court, is also Ashapura's Chairman and has a "controlling interest in Ashapura") – with the Garnishees initially contending that such proceeds had been owed to Mr. Shah (Exhibit E, pg. 5).

16.    At an evidentiary hearing held on August 15, 2011 (relevant excerpts of the transcript of which are annexed as Exhibit G), AMCOL's Chief Financial Officer, Mr. Donald Pearson, testified on behalf of all of the Garnishees that their debt for the Excess Sale Proceeds (which was captured by the attachment) had been "satisfied or extinguished" through a "series of other related or unrelated business transactions" (ibid, pgs. 83 and 85).

17.    Noting that "[t]estimony at the hearing [had] revealed that [Ashapura's representative was] no longer demanding return of the excess stock proceeds," such that "the AMCOL Garnishees would keep this amount if [Armada had] failed to prove its entitlement to the funds" (Exhibit E, pg. 5, fn. 6), the District Court then entered the Pre-Petition Turn Over Order and Judgment in the Rule B Action, directing the AMCOL Garnishees to turn over $687,356.52 to Armada, representing the amount of the Excess Sale Proceeds ("$669,151.23") plus an additional $18,205.29 for "outstanding invoices." (Exhibit F).

## THE NEED FOR A CARVE-OUT TO ENSURE THAT ANY PRELIMINARY INJUNCTIVE RELIEF DOES NOT IMPROPERLY RESTRAIN ARMADA'S RIGHT TO PROCEED AGAINST NON-DEBTOR PROPERTY

18.    It is well established that "the automatic stay protect[s] *only* the debtor, property of the debtor or property of the estate . . . [It] does not stay actions against guarantors, sureties, corporate affiliates, or other non-debtor parties liable on the debts of the debtor.'" Boucher v. Shaw, 572 F.3d 1087, 1092-1093 (9th Cir. 2009) (internal citations omitted; emphasis added); Lockard v. O'Malley Lumber Company, 884 F.2d 1171 (9th Cir. 1989).

19.    There is an "'overwhelming weight of authority' under both the Bankruptcy Act and Code [which] holds that a contractor has no property interest in a surety bond issued by a third-party to guarantee the contractor's performance on its commercial or personal services

6

contracts." Lockard, supra, 884 F. 2d at 1177 (emphasis added), citing, inter alia, Globe Construction Co. v. Oklahoma City Housing Authority, 571 F.2d 1140 (10th Cir.1978).

20.     Thus, a "bankruptcy court has no jurisdiction to enjoin [an] *in personam* action against [the] guarantor of bonds secured by mortgage upon property owned by debtor." Globe Construction Co., supra, 571 F.2d at 1143 (emphasis added); In re Stanndco Developers, Inc., 534 F.2d 1050, 1052-53 (2d Cir. 1976) ("district court in reorganization proceedings had no jurisdiction to enjoin state court action against surety on mechanic's lien release bond") (emphasis added).   Accord McLean Trucking Company v. Department of Industrial Relations, 74 B.R. 820, 828  (Bankr. W.D.N.C., 1987) ("[A]uthorities establish that a bond posted by a surety to secure the obligations of the debtor does not constitute property of the estate, and that a bankruptcy court lacks jurisdiction to enjoin proceedings to collect on the bond)".

21.     Indeed, "[w]ell-reasoned precedent has established that even where the issuer of a surety bond or, in similar circumstances, the issuer of a letter of credit has recourse against collateral pledged by a debtor, a court may not enjoin the beneficiary of the bond or the letter of credit from calling the obligation of the issuer." In re McLean Trucking Company, supra, 74 B.R. at 828.  There the court cited with approval the decision of the Bankruptcy Court in the Southern District of New York in In re. M.J. Sales & Distribution Co., Inc., 25 B.R. 608 (Bankr.S.D.N.Y. 1982), in support of its rejection of an argument that the court had jurisdiction to foreclose on a bond held by a non-debtor surety, because debtor property might somehow be affected through a sequence of claims under a "domino theory." In re McLean, 74 B.R. at 828; accord Enron Power Marketing, Inc. v. California Power Exchange Corp. (In re Enron Corp.), No. 04-8177, 2007 WL 2825727, *4 (S.D.N.Y. 2007) (citing M.J. Sales with approval); In re OCANA, 151 B.R. 670, 672 (S.D.N.Y. 1993) (same); Empire Enterprises JKB, Inc. v. Union

7

City Contractors, Inc., 660 F.Supp.2d 492, 495-96 (W.D.N.Y. 2009) (action against bond surety not stayed by bankruptcy filing of principal on the bond); Westinghouse Credit Corporation v. Page (In re Page), 18 B.R. 713 (D.D.C. 1982); In re Illinois-California Express, Inc., 50 B.R. 232 (Bankr.D.Colo. 1985); and In re Stanndco Developers, Inc., 534 F.2d 1050 (2d Cir. 1976);

22. Absent this rule (carving out third party surety bonds from the reach of a bankruptcy stay) "every prospective debtor [would be able] to shield its sureties, guarantors, co-makers, letter of credit banks and similarly situated parties, merely by offering to collateralize the debtor's reimbursement obligation to such third party." In re McClean, supra, 74 B.R. at 828.

23. The exclusion of a surety bond from the scope of property that can be subject to a bankruptcy stay applies with even more force where the surety lacks direct recourse against the debtor, as is true in the instant case. Here, the Garnishees (not Ashapura) are the "Principals" under the Surety Bond (Exhibit B, pg. 4), thereby making the Surety Bond that much further removed from any property interest that Ashapura might claim. See In re M.J. Sales & Distributing Company, Inc., 25 B.R. 608 (Bankr.S.D.N.Y. 1982). There the Bankruptcy Court ruled that a surety bond posted to secure the vacatur of a default judgment against a debtor in bankruptcy was not property of a debtor's estate, observing that the surety had no recourse against the debtor, but only against a letter of credit that had been issued by a bank. The court in M.J. Sales observed that collection under the bond could not be said to implicate any property interest of the debtor, notwithstanding that the surety's recourse against a bank's letter of credit could, in turn, trigger recourse by the bank against property that the debtor had pledged as collateral to the bank. The court reasoned that both the surety and the bank would pay their obligations out of their own funds, and the only "property of the debtor" at issue was the debtor

8

property held by the bank (and not the bond held by the sureties against whom the creditor was allowed to proceed).

24.     Here, as in <u>M.J. Sales</u>, Armada's rights against the Surety Bond are at least two steps removed from any possible rights against Ashapura or its property. If Armada proceeds against the Surety Bond, Travelers would pay Armada with its own funds. Likewise, any recourse that Travelers might have would be against its Principals, the Garnishees. There is nothing whatsoever in the record to suggest that the Garnishees would have any direct recourse against any property of Ashapura. And even if such a showing could be made, a proper stay would be limited in scope to the parties actually holding debtor property, and would not extend to any substitute security, such as a bond or a letter of credit. <u>In re M.J. Sales.</u>

25.     All of the foregoing confirms that the Surety Bond is not Ashapura's property and is not properly the subject of a bankruptcy stay.[2]

26.     Armada's enforcement of the Pre-Petition Turn Order and Judgment against the Garnishees is likewise, not directed against property of Ashapura because, as already noted, the Garnishees extinguished $669,151.23 of their obligations to Ashapura prior to the District Court's issuance of the turn over order. Moreover, the funds directed to be turned over by the Garnishees became property of Armada with the issuance of that turn over order, which occurred prior to Ashapura's filing of its Chapter 15 Petition.

---

[2] In fact, Chapter 15 expressly prohibits the granting of any relief that would affect bonds that insurers, such as Travelers, are permitted to provide for the benefit of claim holders, such as Armada. 11 U.S.C. § 1501(d) ("The court may not grant relief under this chapter with respect to any deposit, escrow, trust funds, or other security required or permitted under any applicable State insurance law or regulation for the benefit of claim holders in the United States."). Here, suretyship arrangements (such as the Surety Bond) are a "class of insurance" permitted by the Insurance Code of Illinois, where Travelers issued the Surety Bond (215 ILCS 5-4).

**ARMADA EXPRESSLY RESERVES THE RIGHT TO ADDRESS
A FURTHER ARGUMENT ALLUDED TO BY COUNSEL BUT
NOT SET FORTH IN ASHAPURA'S PAPERS**

27.     After the hearing in this proceeding held on October 5, 2011, Ashapura's attorneys indicated that they may seek to raise a new question which is not mentioned in Ashapura's motion papers – namely, whether allowing Armada to proceed against the Surety or the Surety Bond might somehow result in substituting Armada's claim against Ashapura with a claim by the Garnishees that might have a higher priority.

28.     As of this writing, Ashapura's counsel has advised us that they are still in the process of gathering information from their client to assess this question and that Ashapura may ultimately determine not to oppose allowing Armada to proceed against the Surety Bond. Accordingly, Armada expressly reserves the right to address any submission that Ashapura may make to the Court on this issue.

29.     In all events, we respectfully submit that the concern alluded to by Ashapura's counsel would be unfounded for several reasons and would be legally baseless. First, even if Armada were an unsecured claimant of Ashapura in respect of the amount awarded in the Rule B Action (which it is not), and even if the Garnishees were to somehow obtain a secured claim against Ashapura following Armada's payment under the Surety Bond (which has not been demonstrated), such a result would provide no basis for enjoining Armada from taking action against the Surety Bond or other non-debtor property under the holdings of In re M.J. Sales, supra  (25 B.R. at 615) and In re McClean, supra (74 B.R. at 828).

30.     Second, at the time of the issuance of the Pre-Petition Turnover Order and Judgment (awarding to Armada $687,356.52 that had once been owed by the Garnishees to Ashapura), such funds became property of Armada.  Thus, an injunction prohibiting Armada

from pursuing its rights under the Pre-Petition Turn Over Order and Judgment would have the effect of improperly reversing pre-petition rulings of the District Court in the Rule B Action that the funds to be turned over became property of Armada prior to Ashapura's Chapter 15 filing.

31.     Third, even if the property covered by the Turn Over Order and Judgment could somehow be viewed as property of Ashapura (which it cannot) Armada would then be a secured creditor of Ashapura – not an unsecured creditor. It is settled that a pre-petition "judicial turnover order" directed against a defendant who becomes a debtor in bankruptcy "create[s] a secured claim" in the subsequently filed bankruptcy case. In re Monroe, 282 B.R. 219, 223-224 (Bankr. Ariz. 2002). Thus, counsel's concern that the mix of secured claims vs. unsecured claims against Ashapura would be adversely affected is baseless for the further reason that such mix would either be improved or remain the same.

32.     For all of these reasons, any concern by Ashapura about any claim that the Garnishees might pursue following a recovery by Armada under the Surety Bond is misplaced and, in all events, is unavailing to warrant an expansive injunction covering the Surety Bond or any other recourse by Armada against non-debtor property.

## CONCLUSION

WHEREFORE, Armada respectfully requests the Court grant the carve-out requested in this limited objection, together with such other and further relief as the Court may deem to be just, proper and equitable.

Dated: New York, New York
       October 18, 2011

**EATON & VAN WINKLE LLP**

By:   /s/ Robert K. Gross
      Robert K. Gross
      Alan Van Praag
      Edward W. Floyd

      3 Park Avenue
      New York, New York 10016
      (212) 779-9910

      ***Attorneys for Armada (Singapore) Pte Limited***

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ARMADA (SINGAPORE) PTE LIMITED,    )
                                  )
                 Plaintiff,      )     Case No.10-CV-05509
                                  )
       v.                      )     Judge:  Elaine E. Bucklo
                                  )
ASHAPURA MINECHEM LIMITED,    )     Magistrate:  Jeffrey Cole
                                  )
               Defendant.    )

## MARITIME ATTACHMENT AND GARNISHMENT SUMMONS

TO:   **Volclay International Corporation**
      **c/o CT Corporation System**
      **208 S. LaSalle St.**
      **Chicago, IL 60604**

WHEREAS, on August 31, 2010, Plaintiff, ARMADA (SINGAPORE) PTE LIMITED, filed a Verified Complaint against Defendant, ASHAPURA MINECHEM LIMITED, for breach of maritime contract, wherein it is alleged that there is due and owing from the Defendant to the Plaintiff the amount of $67,260,245.40 and praying for process of maritime attachment and garnishment against the Defendant, ASHAPURA MINECHEM LIMITED, and Garnishee; and

WHEREAS, this process is issued pursuant to such prayer and requires that garnishee shall serve its answer, together with answers to any interrogatories served with the Verified Complaint, within 20 days after service of process upon it and requires that the Defendant shall serve its answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendant cannot be found within the District, pursuant to Federal Supplemental Rule B for Certain Admiralty and Maritime Claims, you garnish and attach goods and chattels up to the amount sued for, $67,260,245.40; and if such property cannot be found, that you attach money, accounts, bunkers, goods, and chattels and/or credits and effects of Defendant up to the amount sued for, $67,260,245.40, in the hands of or under the control or custody of garnishees in this District, including, but not limited to **Volclay International Corporation** which are believed to be due and owing to the defendant, to wit: property including monies or accounts owned by Defendant, owned to defendant, or alleged to be owed to Defendant, deposits, letters of credit, cash, funds, credits, bills of lading, electronic fund transfers, debts, or other assets or property, in whatever form, belonging or owed to Defendant, ASHAPURA MINECHEM LIMITED, and that you promptly after execution of this process, file the same in this Court, with your return thereon.

WITNESS THE HONORABLE JUDGE
OF SAID COURT

By:_____ MICHAEL W. DOBBINS
CLERK OF COURT

By:_____
DEPUTY CLERK OF COURT

Date:_____ SEP 02 2010

Prepared By:

Dennis Minichello
Marwedel, Minichello & Reeb, P.C.
10 S. Riverside Plaza
Suite 720
Chicago, IL 60606
312/445-5312
*Attorneys for Plaintiff*

*NOTE: This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.*

T:21694/maritime attachment volclay

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ARMADA (SINGAPORE) PTE LIMITED, )
                                     )
                 Plaintiff,     )    Case No. 10-CV-05509
                                     )
        v.                     ·)    Judge: Elaine E. Bucklo
                                     )
ASHAPURA MINECHEM LIMITED,   )    Magistrate: Jeffrey Cole
                                     )
             Defendant.     )

## MARITIME ATTACHMENT AND GARNISHMENT SUMMONS

TO:    **Amcol International Corp.**
       **c/o CT Corporation System**
       **208 S. LaSalle St.**
       **Suite 814**
       **Chicago, IL 60604**

WHEREAS, on August 31, 2010, Plaintiff, ARMADA (SINGAPORE) PTE LIMITED, filed a Verified Complaint against Defendant, ASHAPURA MINECHEM LIMITED, for breach of maritime contract, wherein it is alleged that there is due and owing from the Defendant to the Plaintiff the amount of $67,260,245.40 and praying for process of maritime attachment and garnishment against the Defendant, ASHAPURA MINECHEM LIMITED, and Garnishee; and

WHEREAS, this process is issued pursuant to such prayer and requires that garnishee shall serve its answer, together with answers to any interrogatories served with the Verified Complaint, within 20 days after service of process upon it and requires that the Defendant shall serve its answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendant cannot be found within the District, pursuant to Federal Supplemental Rule B for Certain Admiralty and Maritime Claims, you garnish and attach goods and chattels up to the amount sued for, $67,260,245.40; and if such property cannot be found, that you attach money, accounts, bunkers, goods, and chattels and/or credits and effects of Defendant up to the amount sued for, $67,260,245.40, in the hands of or under the control or custody of garnishees in this District, including, but not limited to **Amcol International Corp.** which are believed to be due and owing to the defendant, to wit: property including monies or accounts owned by Defendant, owned to defendant, or alleged to be owed to Defendant, deposits, letters of credit, cash, funds, credits, bills of lading, electronic fund transfers, debts, or other assets or property, in whatever

form, belonging or owed to Defendant, ASHAPURA MINECHEM LIMITED, and that you promptly after execution of this process, file the same in this Court, with your return thereon.

WITNESS THE HONORABLE JUDGE
OF SAID COURT
MICHAEL W. DOBBINS
By:_____
CLERK OF COURT

By:_____
DEPUTY CLERK OF COURT
SEP 02 2010

Date:_____

Prepared By:

Dennis Minichello
Marwedel, Minichello & Reeb, P.C.
10 S. Riverside Plaza
Suite 720
Chicago, IL 60606
312/445-5312
*Attorneys for Plaintiff*

*NOTE: This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.*

Tr/21694/maritime attachment amed

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARMADA (SINGAPORE) PTE LIMITED,　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　　　)　　Case No. 10-CV-05509
　　　　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　　　　)　　Judge: Elaine E. Bucklo
　　　　　　　　　　　　　　　　　　　　)
ASHAPURA MINECHEM LIMITED,　　　　　　)　　Magistrate: Jeffrey Cole
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendant.　　　　　)

## MARITIME ATTACHMENT AND GARNISHMENT SUMMONS

TO:　**American Colloid Company**
　　　**c/o CT Corporation System**
　　　**208 S. LaSalle St.**
　　　**Suite 814**
　　　**Chicago, IL 60604**

WHEREAS, on August 31, 2010, Plaintiff, ARMADA (SINGAPORE) PTE LIMITED, filed a Verified Complaint against Defendant, ASHAPURA MINECHEM LIMITED, for breach of maritime contract, wherein it is alleged that there is due and owing from the Defendant to the Plaintiff the amount of $67,260,245.40 and praying for process of maritime attachment and garnishment against the Defendant, ASHAPURA MINECHEM LIMITED, and Garnishee; and

WHEREAS, this process is issued pursuant to such prayer and requires that garnishee shall serve its answer, together with answers to any interrogatories served with the Verified Complaint, within 20 days after service of process upon it and requires that the Defendant shall serve its answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendant cannot be found within the District, pursuant to Federal Supplemental Rule B for Certain Admiralty and Maritime Claims, you garnish and attach goods and chattels up to the amount sued for, $67,260,245.40; and if such property cannot be found, that you attach money, accounts, bunkers, goods, and chattels and/or credits and effects of Defendant up to the amount sued for, $67,260,245.40, in the hands of or under the control or custody of garnishees in this District, including, but not limited to **American Colloid Company** which are believed to be due and owing to the defendant, to wit: property including monies or accounts owned by Defendant, owned to defendant, or alleged to be owed to Defendant, deposits, letters of credit, cash, funds, credits, bills of lading, electronic fund transfers, debts, or other assets or property, in whatever

form, belonging or owed to Defendant, ASHAPURA MINECHEM LIMITED, and that you promptly after execution of this process, file the same in this Court, with your return thereon.

WITNESS THE HONORABLE JUDGE
OF SAID COURT

MICHAEL W. DOBBINS

By:_____
CLERK OF COURT

By:_____
DEPUTY CLERK OF COURT

Date:____SEP 02 2010_____

Prepared By:

Dennis Minichello
Marwedel, Minichello & Reeb, P.C.
10 S. Riverside Plaza
Suite 720
Chicago, IL 60606
312/445-5312
*Attorneys for Plaintiff*

*NOTE: This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.*

Tc 21694/maritime attachment American colloid

# EXHIBIT B

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARMADA (SINGAPORE) PTE LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 10-CV-05509 |
| vs. ) | |
| ) | Judge Elaine E. Bucklo |
| ASHAPURA MINECHEM LIMITED. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| Defendant. ) | |
| ) | |

## BOND AGREEMENT AS SUBSTITUTE SECURITY FOR SUPPLEMENTAL ADMIRALTY RULE B MARITIME ATTACHMENT PURSUANT TO SUPPLEMENTAL ADMIRALTY RULE E(5)

WHEREAS, the Plaintiff, ARMADA (SINGAPORE) PTE LIMITED ("Armada"), has

obtained an Ex Parte Order dated September 1, 2010 authorizing issuance of Process of Maritime

Attachment and Garnishment against garnishees AMCOL International Corporation

("AMCOL"), American Colloid Company ("American Colloid"), and Volclay International

Corporation ("Volclay") (collectively, "AMCOL Companies"), and garnishees JPMORGAN

CHASE CO. A/K/A OR D/B/A CHASE BANK ("Chase"), HARRIS BANK ("Harris"), and

WELLS FARGO BANK ("Wells Fargo") (collectively, "Banks") in the sum of up to SIXTY-

SEVEN MILLION, TWO HUNDRED SIXTY THOUSAND, TWO HUNDRED FORTY-FIVE

and 40/100 DOLLARS as security for its claims against Defendant ASHAPURA MINECHEM

LIMITED ("Ashapura"), which are set forth in a Verified Complaint in this action and are the

subject of a recognition action to confirm the First Award and the Second Award in the United

States District Court for the Southern District of New York, Docket 10-cv-4856;

WHEREAS, Armada issued Maritime Attachment and Garnishment Summonses to the AMCOL Companies and the Banks on or after September 2, 2010;

WHEREAS, Armada claims in the Verified Complaint and the Maritime Attachment and Garnishment Summonses that the AMCOL Companies owe monies or debts to, or have property belonging to, Ashapura as the result of business dealings between the AMCOL Companies and Ashapura;

WHEREAS, the AMCOL companies have no right to invoke any defenses to the underlying dispute between Armada and Ashapura;

WHEREAS, the AMCOL Companies seek to provide partial substitute security in the form of a bond for such alleged monies, debts or property without waiver or prejudice to any of their rights to assert any defenses or rights with respect to the September 1, 2010 Ex Parte Order for Process of Maritime Attachment and the provision of this bond is understood to be entirely without waiver or prejudice to, but is in full reservation of, any and all rights, claims, counterclaims and/or defenses whatsoever which are, or may be, available to the AMCOL Companies or the Banks;

WHEREAS, the partial substitute security in the form of a bond being provided by the AMCOL Companies shall stand as security for any and all tangible and intangible property, monies, property interests, and debts, whatsoever, which, up to the amount of TWO MILLION DOLLARS ($2,000,000): (1) are owned by Ashapura and held by the AMCOL Companies or the Banks; or (2) are owed to Ashapura by the AMCOL Companies or the Banks; or (3) constitute any other form of monies, property, property interest or debt determined to be owned by or owed to Ashapura by the AMCOL Companies (without regard to whether Ashapura's interest in the subject matter is present or contingent) including, without limitation, all the monies, property,

2

property interests and debts described in the Affidavit of Christopher J. Kodosky, sworn to on 8 September 2008, the nature and amount of which shall be subject to further investigation; or (4) fall within the scope of monies, property, property interests, and debts described by the foregoing clauses of this paragraph but which arise or come into the possession, custody or control of the AMCOL Companies or the Banks after the date of the bond's issuance; to the extent that any of the foregoing described in this recital paragraph are determined by the Court to be subject to attachment or garnishment in this District;

NOW, THEREFORE, Travelers Casualty and Surety Company of America, as surety for the AMCOL Companies, in consideration of the release of the Maritime Attachment and Garnishment Summonses issued to the AMCOL Companies and the Banks, binds itself to pay any amounts that are determined, by way of judgment entered by a court of competent jurisdiction against Ashapura, and in favor of Armada, to be owned by or owed to Ashapura, in the possession of the AMCOL Companies and subject to garnishment or attachment in this District, not to exceed the sum of TWO MILLION DOLLARS ($2,000,000).

For the performance of this obligation, the surety hereby obligates itself to the Clerk of Court for the United States District Court for the Northern District of Illinois, in the full sum of $2,000,000.

PROVIDED, HOWEVER, that under no condition shall the liability hereunder exceed the sum of TWO MILLION DOLLARS ($2,000,000).

This bond is furnished entirely without prejudice to any rights or defenses that the AMCOL Companies or the Banks may have, none of which shall be deemed to have been waived by the provision of this bond.

Dated: September 17, 2010

Travelers Casualty and Surety Company of America
(Surety)

By: _____

   Susan A. Welsh, Attorney-in-Fact

AMCOL International Corporation
(Principal)

By: _____

American Colloid Company
(Principal)

By: _____

Volclay International Corporation
(Principal)

By: _____

i

# POWER OF ATTORNEY

 **TRAVELERS**

Farmington Casualty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company

St. Paul Mercury Insurance Company
Travelers Casualty and Surety Company
Travelers Casualty and Surety Company of America
United States Fidelity and Guaranty Company

Attorney-In Fact No. 222743

Certificate No. 003848196

KNOW ALL MEN BY THESE PRESENTS: That St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, that Farmington Casualty Company, Travelers Casualty and Surety Company, and Travelers Casualty and Surety Company of America are corporations duly organized under the laws of the State of Connecticut, that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc., is a corporation duly organized under the laws of the State of Wisconsin (herein collectively called the "Companies"), and that the Companies do hereby make, constitute and appoint

Debra J. Doyle, Diane M. O'Leary, Douglas M. Schmude, Geoffrey E. Heekin, James B. McTaggart, Jennifer L. Jakaitis, Judith A. Lucky, Karen E. Bogard, Karen L. Daniel, Kathleen J. Mailes, Kimberly Bragg, Linda M. Iser, Richard A. Moore Jr., Sandra M. Martinez, Sandra M. Nowak, Susan A. Welsh, and William P. Reidinger

of the City of _____ Chicago _____, State of _____ Illinois _____, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign, execute, seal and acknowledge any and all bonds, recognizances, conditional undertakings and other writings obligatory in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

IN WITNESS WHEREOF, the Companies have caused this instrument to be signed and their corporate seals to be hereto affixed, this _____ 18th _____ day of _____ August _____, 2010 _____.

Farmington Casualty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company

St. Paul Mercury Insurance Company
Travelers Casualty and Surety Company
Travelers Casualty and Surety Company of America
United States Fidelity and Guaranty Company

State of Connecticut
City of Hartford ss.

By: _____
George W. Thompson, Senior Vice President

On this the 18th day of August, 2010, before me personally appeared George W. Thompson, who acknowledged himself to be the Senior Vice President of Farmington Casualty Company, Fidelity and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc., St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, and United States Fidelity and Guaranty Company, and that he, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

In Witness Whereof, I hereunto set my hand and official seal.
My Commission expires the 30th day of June, 2011.

_____
Marie C. Tetreault, Notary Public

58440-4-09 Printed in U.S.A.

This Power of Attorney is granted under and by the authority of the following resolutions adopted by the Boards of Directors of Farmington Casualty Company, Fidelity and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc., St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, and United States Fidelity and Guaranty Company, which resolutions are now in full force and effect, reading as follows:

RESOLVED, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the Company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her; and it is

FURTHER RESOLVED, that the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary; and it is

FURTHER RESOLVED, that any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary; or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority; and it is

FURTHER RESOLVED, that the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any Power of Attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such Power of Attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding on the Company in the future with respect to any bond or understanding to which it is attached.

I, Kori M. Johanson, the undersigned, Assistant Secretary, of Farmington Casualty Company, Fidelity and Guaranty Insurance Company, Fidelity and Guaranty Insurance Underwriters, Inc., St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, Travelers Casualty and Surety Company, Travelers Casualty and Surety Company of America, and United States Fidelity and Guaranty Company do hereby certify that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this 17th day of September, 20 10.

Kori M. Johanson, Assistant Secretary

        

To verify the authenticity of this Power of Attorney, call 1-800-421-3880 or contact us at www.travelersbond.com. Please refer to the Attorney-In-Fact number, the above-named individuals and the details of the bond to which the power is attached.

## ACKNOWLEDGEMENT BY SURETY

STATE OF ILLINOIS
COUNTY OF COOK

On this 17th day of September, 2010, before me, Jessica B. Yates Notary Public, within and for said County and State, personally appeared Susan A. Welsh to me personally known to be the Attorney-in-Fact of Travelers Casualty and Surety Company of America and acknowledged that she executed the said instrument as the free act and deed of said Company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, at my office in the aforesaid County, the day and year in this certificate first above written.

Notary Public in the State of Illinois
County of Cook

OFFICIAL SEAL
JESSICA B YATES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 07/14/2012

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ARMADA (SINGAPORE) PTE LIMITED,　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　Plaintiff,　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | Case No. 10-CV-05509 |
| 　　vs.　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | Judge Elaine E. Bucklo |
| ASHAPURA MINECHEM LIMITED.　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | Magistrate Judge Jeffrey Cole |
| 　　　　　　　Defendant.　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | |

## STIPULATION AND ORDER APPROVING SURETY BOND
## AND RELEASING FUNDS UNDER ATTACHMENT

WHEREAS, the Plaintiff, ARMADA (SINGAPORE) PTE LIMITED ("Armada"), has

obtained an Ex Parte Order dated September 1, 2010 authorizing issuance of Process of Maritime

Attachment and Garnishment against garnishees AMCOL International Corporation

("AMCOL"), American Colloid Company ("American Colloid"), and Volclay International

Corporation ("Volclay") (collectively, "AMCOL Companies"), and garnishees JPMORGAN

CHASE CO. A/K/A OR D/B/A CHASE BANK ("Chase"), HARRIS BANK ("Harris"), and

WELLS FARGO BANK ("Wells Fargo") (collectively, "Banks") in the sum of up to SIXTY-

SEVEN MILLION, TWO HUNDRED SIXTY THOUSAND, TWO HUNDRED FORTY-FIVE

and 40/100 DOLLARS as security for its claims against Defendant ASHAPURA MINECHEM

LIMITED ("Ashapura"), which are set forth in a Verified Complaint in this action and are the

subject of a recognition action to confirm the First Award and the Second Award in the United

States District Court for the Southern District of New York, Docket 10-cv-4856;

WHEREAS, Armada issued Maritime Attachment and Garnishment Summonses to the

AMCOL Companies and the Banks on or after September 2, 2010;

WHEREAS, Armada claims in the Verified Complaint and the Maritime Attachment and Garnishment Summonses that the AMCOL Companies owe monies or debts to, or have property owned by, Ashapura as the result of business dealings between the AMCOL Companies and Ashapura;

WHEREAS, the AMCOL Companies have no right to invoke any defenses to the underlying dispute between Armada and Ashapura;

WHEREAS, the AMCOL Companies seek to provide partial substitute security in the form of a bond for such alleged monies, debts or property without waiver or prejudice to any of their rights to assert any defenses or rights with respect to the September 1, 2010 Ex Parte Order for Process of Maritime Attachment, and the provision of this bond is understood to be entirely without waiver or prejudice to, but is in full reservation of, any and all rights, claims, counterclaims and/or defenses whatsoever which are, or may be, available to the AMCOL Companies or the Banks;

WHEREAS, the partial substitute security in the form of a bond being provided by the AMCOL Companies shall stand as security for any and all tangible and intangible property, monies, property interests, and debts, whatsoever, which, up to the amount of TWO MILLION DOLLARS ($2,000,000): (1) are owned by Ashapura and held by the AMCOL Companies or the Banks; or (2) are owed to Ashapura by the AMCOL Companies or the Banks; or (3) constitute any other form of monies, property, property interest or debt determined to be owned by or owed to Ashapura by the AMCOL Companies (without regard to whether Ashapura's interest in the subject matter is present or contingent) including, without limitation, all the monies, property, property interests and debts described in the Affidavit of Christopher J. Kodosky, sworn to on 8 September 2008, the nature and amount of which shall be subject to further investigation; or (4)

2

fall within the scope of monies, property, property interests, and debts described by the foregoing clauses of this paragraph but which arise or come into the possession, custody or control of the AMCOL Companies or the Banks after the date of the bond's issuance; to the extent that any of the foregoing described in this recital paragraph are determined by the Court to be subject to attachment or garnishment in this District.

WHEREAS, the AMCOL Companies have offered to deposit with the Court a bond in the amount of $2,000,000 (US), a copy of which is attached hereto;

NOW, by stipulation of Armada and the AMCOL Companies pursuant to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions E(5) for the purpose of lifting the maritime attachment issued hereunder;

IT IS HEREBY STIPULATED, ORDERED, ADJUDGED AND DECREED:

1.  That the amount of bond to be provided is agreed at the sum of $2,000,000 (US);

2.  That the form of the bond offered by the AMCOL Companies to be provided by the surety, Travelers Casualty and Surety Company of America, in the amount of $2,000,000 is hereby approved by stipulation of the parties. The amount of the bond is based on initial disclosures by the AMCOL Companies of monies and property and debts owned by or owed to Ashapura in AMCOL Companies' or the Banks' possession, custody or control, which are subject to further investigation, and Plaintiff has relied on those disclosures in agreeing to this Stipulation;

3.  That (a) the maritime attachment of the property owned by or owed to Ashapura in the possession of any and all garnishees in these proceedings, including the AMCOL Companies and the Banks, is hereby released and, the aforementioned bond shall substitute for said property; (b) no further attachment of the property

3

owned by or owed to Ashapura in the possession of the garnishees shall be permitted under the Ex Parte Order dated September 1, 2010, except as provided in paragraph 9, and (c) the Process of Maritime Attachment and Garnishment allowed by the Ex Parte Order is hereby vacated; and

4. Nothing herein shall operate, or be construed as, affecting or limiting the AMCOL Companies' rights to seek relief within this action, including, but not limited to, countersecurity, including for the surety bond premium, under Supplemental Rule E(2)(b) and/or reduction of the amount of the bond. However, the parties to this stipulation expressly agree that Armada reserves its rights to dispute whether the AMCOL Companies are entitled to any and all of the relief described in the foregoing sentence of this paragraph.

5. Plaintiff reserves its right to seek confirmation of the foreign arbitral awards as stated in its complaint in this Rule B Action by way of a motion in this action;

6. Notwithstanding the release of the Order of Maritime Attachment entered by the court, plaintiff shall have the right to seek discovery, in accordance with the Federal Rules of Civil Procedure, from AMCOL Companies, Banks and any other entities regarding property belonging to Ashapura. AMCOL Companies and the Banks shall respond to interrogatories already issued to them at the time of the initiation of this action in accordance with Rule 33 and Supplemental Rule (B)(3)(a).

7. AMCOL Companies shall file their Answer to the Maritime Attachment and Garnishment Summonses issued to them in this action;

4

8. Upon payment to Armada of all amounts that are determined by the Court to be owned by or owed to Ashapura by the AMCOL Companies and subject to attachment or garnishment in this District, Armada and the AMCOL Companies agree to execute such documents as necessary to facilitate the release and cancellation of the bond described above.

9. This Stipulation is without prejudice to any rights that Plaintiff may now have or that Plaintiff may have in the future to assert that additional amounts are subject to garnishment or attachment because they are owned by or owed to Ashapura by the AMCOL Companies, and based on such additional amounts to seek to obtain any order(s) or amended order(s) authorizing issuance of a separate or an amended process of maritime attachment and garnishment either in the above-captioned action or in any other action, or to seek reinstatement of the attachment permitted under Ex Parte Order dated September 1, 2010, of property owned by or owed to Ashapura, which may come into the possession of AMCOL and the Banks after the entry of this Stipulation and Order by the Court. The AMCOL Companies reserve all rights and defenses to any amended, separate or reinstated orders or summonses.

ENTERED:

September 28, 2010

*Elai ? Buldo*

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF ILLINOIS

5

AGREED:

_____
Counsel for the AMCOL Companies

Date: _____

John F. Kloecker
Margaret M. Schuchardt
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-0700
Facsimile: (312) 443-0336

_____
Counsel for Plaintiff Armada (Singapore) Pte. Limited

Date: _____

Warren J. Marwedel
Dennis Minichello
MARWEDEL, MINICHELLO & REEB, P.C.
10 S. Riverside
Suite 720
Chicago, IL 60606
Telephone: (312) 902-1600
Facsimile: (312) 902-9900

6

# EXHIBIT D

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 10 C 5509 | **DATE** | 7/13/2011 |
| **CASE TITLE** | Armada (Singapore) PTE Limited vs. Ashapura Minechem Limited | | |

**DOCKET ENTRY TEXT**

Plaintiff Armada's motion to recognize, confirm, enter judgment on, and enforce foreign arbitral awards [39] is entered and continued. The court sets an evidentiary hearing for 8/15/11 at 10:00 a.m. at which time the parties will put on evidence directed to: (1) the ownership of the excess stock proceeds; and (2) interest due on the excess proceeds. Ruling set for 7/22/11 is now vacated.

■[ For further details see text below.] Docketing to mail notices.

---

## STATEMENT

After a dispute arose between plaintiff Armada (Singapore) PTE Limited ("Armada") and defendant Ashapura Minechem Limited ("Ashapura") concerning two "contracts of affreightments" in which plaintiff agreed to transport bauxite from India to China, a British arbitrator awarded plaintiff approximately $67 million. On August 31, 2010, plaintiff brought this *quasi in rem* action pursuant to the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims. On September 1, 2010, I authorized the issuance of Process of Maritime Attachment and Garnishment, which was served on the following garnishees: AMCOL International Corporation, Volclay International Corporation, and American Colloid Company (the "AMCOL Garnishees"), as well as on JPMorgan Chase Co., Harris Bank, and Wells Fargo Bank (the "Banks"). Following service of process, the AMCOL Garnishees made disclosures regarding property owned by, or owed to, defendant Ashapura in the possession or control of the AMCOL Garnishees. In exchange for plaintiff's agreement to release the attachment, the AMCOL Garnishees provided a $2 million bond as security. Despite apparently being served, defendant Ashapura has not appeared or otherwise participated in this case. Plaintiff has filed a "motion to recognize, confirm, enter judgment on, and enforce foreign arbitral awards" in which it asserts that the AMCOL Garnishees possess or control at least $814,657.00 on behalf of defendant and that such amount should be turned over to plaintiff. The AMCOL Garnishees dispute that this figure is correct.

Excess Stock Proceeds: The largest part of the $814,657.00 comes from excess proceeds from a stock sale. Plaintiff argues that the AMCOL Garnishees owe defendant $672,961.00 (30,115,000 Indian Rupees) in connection to a stock sale. In December 2009, Volclay sold certain shares of Ashapura stock in the Indian public market. *See* AMCOL Garnishees' Ex. A, ¶ 18. The market price exceeded the sale price that was previously approved by the Indian government, and this excess amount was deposited into an Indian bank account by Volclay. The excess proceeds remained in this account for over a year, during which time Volclay was prohibited from withdrawing the funds pending approval from Indian governmental authorities. On April 6, 2011, the funds were transferred to a Volclay account in the United States.

## STATEMENT

The AMCOL Garnishees argue that there is a question regarding the rightful ownership of the excess proceeds. They claim that Ashapura'a president, Chetan Shah, has taken the position that the excess proceeds are owed to him personally, and not to defendant Ashapura. Conversely, plaintiff has put forward evidence that Ashapura itself is owed the excess proceeds. Having reviewed the exhibits produced by plaintiff and the AMCOL Garnishees, there is a disputed issue of fact as to who/what can claim ownership to the excess proceeds. Plaintiff provides multiple emails and documents in which Ashapura, the corporate entity, is listed as the party to whom the excess proceeds should be paid. *See, e.g.,* AMC001151-AMC001152, AMC000779, AMC000734-AMC000747. In response, the AMCOL Garnishees have provided evidence, primarily in the form of deposition testimony, that the money is owed to Chetan Shah and not Ashapura itself. *See* C. Kodosky Dep. at 84-86, 136-37. In light of this dispute, an evidentiary hearing will be necessary to determine whether plaintiff can meet its burden of showing that the excess proceeds belongs to Ashapura. *See Maryland Tuna Corp. v. MS Benares*, 429 F.2d 307, 322 (2d Cir. 1970). I will consider plaintiff's additional point, regarding Volclay's motivation in light of its partial ownership of Ashapura, in evaluating the evidence and credibility of the witnesses. To plaintiff's argument regarding "injecting ambiguity," I agree with plaintiff that there is "ambiguity" here regarding ownership, but I do not necessarily agree that the evidence shows that the AMCOL Garnishees have "injected" it into these proceedings.

Interest on Excess Stock Proceeds: In addition to the issue of the excess stock proceeds, plaintiff argues that the AMCOL Garnishees also owe Ashapura thirteen (13) percent interest on the excess sale proceeds. The AMCOL Garnishees respond that they never reached agreement on the proposed 13% interest. In order to resolve this dispute, I will hear evidence on this issue at the evidentiary hearing.

Set-Off: The AMCOL Garnishes argue that they can set-off a purported debt of $109,619.70 which Ashapura owes Volclay pursuant to a September 2000 Sale of Goods Agreement. In response, plaintiff argues that a party is not entitled to a set-off which it asserted *after* the Rule B attachment was effectuated. Further, plaintiff argues that the claim which forms the basis for the AMCOL Garnishees' set-off argument is time-barred under the Illinois UCC. The AMCOL Garnishees cite no cases whatsoever which would support their right to set-off in these circumstances, and do not address the statute of limitations issue.

In *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 48 (2d Cir. 1996), plaintiffs Aurora and Madmar and defendant Fahem entered into an agreement to transport grain from the United States to Yemen. After disputes arose, plaintiffs won an arbitration award against Fahem. Plaintiffs served Hongkong and Shanghai Banking Corporation Limited ("HSBC") with supplemental process of maritime attachment and garnishment under Rule B and attached $633,713.39 located in Fahem's account at HSBC. HSBC moved to vacate the Rule B attachment, arguing that it should be allowed to exercise a right of set-off under state law because Fahem already owed it $56 million. The Second Circuit held that, in light of the historical importance of maritime attachment and the need for uniformity, federal maritime law preempted the state law right to set-off. 85 F.3d at 48. Finding this case persuasive, I reject the AMCOL Garnishees' set-off argument because they asserted their right to set-off *after* the Rule B attachment was effectuated.[1]

Open Invoices: I likewise reject the set-off argument made by the AMCOL Garnishees (coming as it does post-attachment) with respect to the $10,721 in overpayments. Plaintiff's argument that the AMCOL Garnishees owe Ashapura $18,205 for open invoices arising from certain product purchases is undisputed. Therefore, plaintiff is entitled to $10,721 from the AMCOL Garnishees.

In conclusion, plaintiff Armada's motion to recognize, confirm, enter judgment on, and enforce foreign arbitral awards [39] is entered and continued. The court sets an evidentiary hearing for 8/15/11 at 10:00 a.m. at which time the parties will put on evidence directed to: (1) the ownership of the excess stock proceeds; and (2)

## STATEMENT

interest due on the excess proceeds.

1. Rather than cite to any cases, the AMCOL Garnishees cite to 29-705 Moore's Federal Practice § 705.04(c)(e) to support their claim of set-off. While it does appear to recognize set-off in the attachment context, Moore's cites to only two cases for support. First, it cites to a 1915 Second Circuit case which is clearly not good law in light of *Aurora Maritime*. Second, it cites to a 1964 Ninth Circuit case, *San Rafael Compania Naviera, S.A. v. American Smelting & Refining Co.*, 327 F.2d 581 (9th Cir. 1964), which does not contain any substantive discussion of either set-off or the history and importance of maritime attachment. In the end, I am persuaded to follow the Second Circuit's reasoning in *Aurora Maritime* as that court fully analyzed the issues raised by a claim of set-off in the maritime attachment context.

10C5509 Armada (Singapore) PTE Limited vs. Ashapura Minechem Limited

Page 3 of 3

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARMADA (SINGAPORE) PTE LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 10 C 5509 |
| ASHAPURA MINECHEM LIMITED, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

On August 15, 2011, plaintiff Armada (Singapore) PTE Limited ("Armada") and AMCOL International Corporation, Volclay International Corporation and American Colloid Company (the "AMCOL Garnishees") presented evidence[1] on the following two issues: the ownership of the excess stock proceeds and the interest due (if any) on the excess stock proceeds.[2] As explained below, I conclude that the AMCOL Garnishees owe the excess stock proceeds to Ashapura, not Chetan Shah, and therefore plaintiff is entitled to payment of the excess stock proceeds. However, plaintiff has not

---

[1] Both plaintiff and the AMCOL Garnishees submitted post-hearing briefs. Because I did not request such briefs and neither side sought permission to file them, I did not consider them.

[2] For a more detailed discussion of the background facts of this dispute, see my July 13, 2011 minute order.

met its burden with respect to the alleged thirteen percent interest on the funds.[3]

Turning first to the issue of ownership of the excess stock proceeds, I rely on a series of emails[4] introduced by Armada at the hearing to conclude that the AMCOL Garnishees owe the excess stock proceeds to Ashapura and not Chetan Shah individually. Plaintiff's Exhibit 1 at AMC001151 is a January 13, 2010 email from Don Pearson, Vice-President and Chief Financial Officer at AMCOL International Corporation, to Ajay Phalod, Business Development Manager at Ashapura. This email from Pearson reads:

> As agreed between AMCOL and Ashapura in 2009 and finalized in December, AMCOL's 950,000 shares of Ashapura were sold to Ashapura at Rs38. The price on the open market at the time of the sale was Rs 69.70. The excess price above Rs 38, after adjusting for selling costs, will be transferred to the account identified by Ashapura. AMCOL will absorb the US tax on the gain. Ashapura will forward the same amount in USD to AANV, within four weeks of AMCOL's initial transmission to the Ashapura named account, and the amount will be applied to debt that AANV has to AMCOL's subsidiary, AMCOL Minerals Europe Ltd. At today's exchange rate of 45.6, the amount approximates USD 653,000. AMCOL will transfer the amount at the Rs/USD exchange rate at the time of transfer.

This email, which post-dated the sale of stock in December 2009 by only a few weeks, provides compelling evidence that AMCOL agreed to

---

[3]    Plaintiff has the burden of proving that the garnishees possess property belonging to the defendant. *See K/S A/S SEA Team v. Colocotronis (Greece) S.A.*, No. 76 Civ. 4019, 1978 LEXIS 16786, at *11 (S.D.N.Y. July 5, 1978).

[4]    There was no written agreement documenting the agreement reached concerning the sale of the Ashapura stock. 8/15/11 Trans. at 9.

2

pay the excess stock proceeds to Ashapura. Chetan Shah is never mentioned in this email as a potential recipient of the proceeds.

There is other documentary evidence that AMCOL owed the excess stock proceeds to Ashapura, and not Chetan Shah. In Plaintiff's Exhibit 2, after a series of emails in July 2010 between Pearson and Phalod concerning the precise amount of the excess stock proceeds, Pearson then emailed Sejal Ghia at AMCOL asking "Can you confirm what the excess Ashapura proceeds is at this point, $635K or $643K?" Ghia responds, "Excess due to AML for Dec 2009 share sale = Rs 30,006,782 at today's fx rate 0.02141 = 642,445." *See* AMC000779. In this email exchange, Ghia stated that the excess stock proceeds were due to AML (Ashapura Minechem Limited), and there is no mention of the proceeds being due to Shah. Likewise, a memorandum entitled "AMCOL and Ashapura Excess Share Purchase" at AMC000756-57, which was an internal AMCOL document created at Pearson's direction, contained multiple references to Ashapura as the entity which was owed the excess share proceeds. The memo stated,

> On December 30, 2009, Ashapura purchased 950,000 shares from AMCOL at a total price of 69.70 rupees before Rs 129,725 in fees. As agreed by the parties, for any price greater than Rs 38, e.g., Rs 31.70 net of fees, AMCOL would forward this amount to Ashapura, who would then remit the amount to AANV to pay down debt by AANV to AMCOL. This amount totals Rs 30,006,782 and is referred to as the excess amount or excess proceeds. The share sale proceeds remain with Sharekhan, AMCOL's broker. Our agreement with Ashapura, requires payment upon receipt of the funds from the broker. There have been technical difficulties whereby the broker has not released the

3

> funds. Ashapura borrowed funds to purchase the shares at
> 13%. AMCOL has an old note from Ashapura, relating to
> AVL, the note had been paid down to $109,619, however,
> interested [sic] had not been accrued since September
> 2007. After adjusting for missing accrued interest at
> one month libor plus 100 bps, the current balance at June
> 30, 2010 is $130,500. Considering the delay in receiving
> the funding for the share proceeds from the broker, AMCOL
> suggested that it credit Ashapura against the $130,500
> note for the interest Ashapura is incurring on its
> borrowing for the purchase of the excess share price.

This internal AMCOL memorandum clearly states that Ashapura is owed
the excess stock proceeds and no where mentions that these funds
should go to Shah personally.

Finally, in Plaintiff's Exhibit 4, a July 14, 2010 email from
Sejal Ghia to Pearson and others at AMCOL, Ghia once again
references the "net amount due to AML" (with AML referencing
Ashapura Minechem Limited). This email also references the fact
(as confirmed by the testimony of Pearson) that AMCOL's own
internal accounting system listed "AML," not Shah, as the entity to
whom the excess stock proceeds were owed.[5]

Further support for plaintiff's position can be found in
Pearson's emails, in which he suggested that, instead of AMCOL
making any cash payments to Ashapura for interest owed on the
excess amount, AMCOL could instead reduce the amount *Ashapura* owed
AMCOL on an outstanding note for $109,000. AMCOL has not put

---

[5]     In addition, I note that all the emails received by Pearson
and others at AMCOL were from Ashapura employees requesting that the
excess stock proceeds be paid, and none were from Shah himself.  This
further supports the notion that Ashapura was due the excess proceeds.

4

forward any explanation as to why Shah, if he were indeed owed both the excess proceeds and the interest personally, would agree to allow AMCOL to reduce Ashapura's corporate debt. This suggestion by Pearson more logically supports the notion that AMCOL owed Ashapura, and not Shah, the excess stock proceeds.

In reaching this conclusion, I was not convinced by the testimony of Don Pearson. Pearson testified that the AMCOL Garnishees were obligated to pay the excess stock proceeds to Shah, as it was Shah who purchased the shares and borrowed the funds to effectuate the stock purchase. Over and over again, Pearson reviewed the numerous emails he authored which explicitly stated that Ashapura was owed the excess stock proceeds, and testified that those references to Ashapura were shorthand references to Shah. Put simply, in light of the number of references to Ashapura by multiple parties and the fact that AMCOL's own internal accounting system reflected the fact that the proceeds were owed to Ashapura, I did not credit Pearson's testimony.[6]

To counter plaintiff's evidence, the AMCOL Garnishees point to: (1) a September 29, 2009 email from Larry Washow (former CEO of AMCOL) to Don Pearson; and (2) a transcript of a January 22, 2010 quarterly analyst call. Turning first to the email, Washow stated, "Don[,] the

---

[6]     Also noteworthy is the fact that Pearson's company would benefit greatly from a determination that the excess stock proceeds are not due to Ashapura. Testimony at the hearing revealed that Shah is no longer demanding return of the excess stock proceeds, and that the AMCOL Garnishees would keep this amount if plaintiff failed to prove its entitlement to the funds.

5

price difference I guess is actually Chetan's money so we probably can't do much but if it could be used to offset a bit of the Antwerp loan or if there is some way we could keep the difference that would be good. Larry." Even assuming I could properly consider Washow's statement, I do not read this email as providing conclusive evidence that the excess stock proceeds were owed to Shah personally. The most obvious problem with its reliability is Washow's use of the qualifier, "I guess." Given Washow's own obvious uncertainty, this email does not conclusively support the AMCOL Garnishees' position, especially in light of all the post-sale emails discussed above.

Second, the AMCOL Garnishees point to a transcript of a January 22, 2010 quarterly analyst call as support. Putting aside any issues of admissibility of this document, even if I did consider it, it also does not provide strong support for the AMCOL Garnishees. In this transcript, after being asked about the sale of Ashapura shares, Washow responds, "Yeah. We did go through the open market. The other owner ended up buying the shares as a block." AMC001124. Once again, Washow's reference to "the other owner" does not establish that Shah was owed the excess stock proceeds. This reference is too vague to establish anything.

Finally, AMCOL points to a number of pre-stock sale emails which reference negotiations over the stock sale with Shah. For example, in a June 26, 2009 email from Jayesh Doshi (former CFO of Ashapura) to Washow and Pearson, Doshi stated that "we have been discussing to purchase your shares either by Mr. Chetan Shah or family members or any other potential buyer. We have been able to procure some funding for purchase of shares and after my discussion with Mr. Chetan Shah,

6

we can look at buying the entire quantity at around Rs. 35/-."
Garnishees' Exhibit 1 at AMC000546. This email presents no definitive
evidence of who/which entity purchased the shares, as it refers to
Shah, his family members, or "any other potential buyer." Further
complicating matters is Doshi's use of the word "we." Since Doshi is
employed by Ashapura, it is certainly conceivable that "we" refers to
Ashapura and the reference to Shah (as Chairman of Ashapura) is to his
role as negotiator for Ashapura. Nor am I convinced by the other
emails identified by the AMCOL Garnishees which refer to Shah by name
in the negotiations of the stock sale. See, e.g., AMC000545 ("I
think Mr. Chetan Shah's offer at this rate is fair to AMCOL"); id.
("if Chetan wanted to buy at least half of the stock at that price we
could sell the rest in the open market"); AMC000542 ("I think that
would put us in reasonable shape when the SEC comes back with
questions – might also raise the pressure a bit on Chetan to buy it if
he really wants to control more."; AMC000538 ("He said that Chetan can
purchase the shares within a few days of us letting him know we are
ready to sell."); AMC000547 ("if we sell at 38 rupees and the market
is higher Chetan will pay us the market price then we need to somehow
rebate the difference back to him"). Given Shah's controlling
interest in Ashapura and his job as Chairman, it makes sense that
AMCOL would refer to the individual negotiating on Ashapura's behalf.
In addition, even if these emails suggested a more personal
involvement by Shah in the stock deal, all of these emails were sent
prior to the date of the sale. As noted above, there are numerous
emails, sent after the sale was completed, which state that Ashapura
was the buyer of the stock and was owed the excess proceeds. Given

7

that there is no written document to refer to here, I conclude that the emails which post-date the sale more accurately reflect the agreement concerning the stock sale and the excess proceeds.

With respect to the interest payments on the excess stock proceeds, I conclude that plaintiff has not met its burden. In his testimony, Pearson acknowledged that AMCOL offered to pay Ashapura thirteen percent interest on the excess stock proceeds. 8/15/11 Trans. at 25. The internal AMCOL memorandum makes clear that AMCOL's offer to pay interest was to make Ashapura whole for the thirteen percent interest it was incurring as a result of the loan it took out to buy back the shares from AMCOL. AMC000756-57. However, there is no evidence that a final agreement was reached between the AMCOL Garnishees and Ashapura. In an August 30, 2010 email from Pearson to Phalod, Pearson stated, "On the excess shares, AMCOL was willing to compensate Ashapura for the cost of interest, approximately $49K through July. I recommended simply reducing the balance on the note receivable from Ashapura. You noted that you may require a cash exchange. I can do either, but require your decision." AMC000748. While this email suggests that the parties were close to an agreement, it also indicates that their were certain terms which were still being negotiated and were not final. Without more, I cannot conclude that there was an agreement concerning interest payments.

Turning to the final calculation of funds owed to plaintiff, I conclude that the AMCOL Garnishees must turn over $687,356.52 to plaintiff. This figure represents $669,151.23 in excess stock proceeds (30,006,782 Rupees at the exchange rate in effect on April 6, 2011, the day that the excess stock proceeds were transferred from

8

India to the AMCOL Garnishees), *see* AMC000756-57, and the $18,205.29 owed by the AMCOL Garnishees to Ashapura, *see* 7/13/11 Minute Order.

Plaintiff's motion to recognize, confirm, enter judgment on, and enforce foreign arbitral awards [38] is therefore granted to the extent described herein, without prejudice to plaintiff's right to pursue recognition, confirmation, judgment on, and enforcement of the awards in any other actions for the outstanding balance of the awards. I direct that the property to be turned over by the AMCOL Garnishees to the plaintiff's attorneys shall not be subject to any further attachment or restraint. Upon turnover by the AMCOL Garnishees to plaintiff's attorneys, Bond Number 105483459, dated September 17, 2010, shall be cancelled.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

DATED: August 29, 2011

9

# EXHIBIT F

# United States District Court
## Northern District of Illinois
### Eastern Division

Armada (Singapore)

v.

Ashapura Minechem Limited

**JUDGMENT IN A CIVIL CASE**

Case Number: 10 C 5509

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion to recognize, confirm, enter judgment on, and enforce foreign arbitral awards [38] is granted to the extent described herein, without prejudice to plaintiff's right to pursue recognition, confirmation, judgment on, and enforcement of the awards in any other actions for the outstanding balance of the awards.

The AMCOL Garnishees must turn over $687,356.52 to plaintiff. This figure represents $669,151.23 in excess stock proceeds (30,006,782 Rupees at the exchange rate in effect on April 6, 2011, the day that the excess stock proceeds were transferred from India to the AMCOL Garnishees), and the $18,205.29 owed by the AMCOL Garnishees to Ashapura.

I direct that the property to be turned over by the AMCOL Garnishees to the plaintiff's attorneys shall not be subject to any further attachment or restraint. Upon turnover by the AMCOL Garnishees to plaintiff's attorneys, Bond Number 105483459, dated September 17, 2010, shall be cancelled.

Michael W. Dobbins, Clerk of Court

Date: 8/29/2011

_____

/s/ Mathew P. John, Deputy Clerk

# EXHIBIT G

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3

ARMADA (SINGAPORE) PTE LIMITED,      )   No. 2010 C 5509
4                 Plaintiff,         )   August 15, 2011
         v.                          )   10:00 a.m.
5   ASHAPURA MINECHEM LIMITED,        )
                  Defendant.         )
6

        TRANSCRIPT OF PROCEEDINGS - HEARING
7          BEFORE THE HON. JEFFREY COLE

8

APPEARANCES:
9

On behalf of Plaintiff:    MR. DENNIS MINICHELLO
10                         MARWEDEL, MINICHELLO & REEB, P.C.
                           10 South Riverside Plaza, Suite 720
11                         Chicago, Illinois 60606
                           (312) 902-1600
12
                           MR. EDWARD W. FLOYD
13                         EATON & VAN WINKLE, LLP
                           3 Park Avenue
14                         New York, New York 10016
                           (212) 561-3614
15

16  On behalf of Defendant:    MR. JOHN F. KLOECKER
                               MS. MARGARET M. SCHUCHARDT
17                             LOCKE LORD BISSELL & LIDDELL, LLP
                               111 South Wacker Drive
18                             Chicago, Illinois 60606
                               (312) 443-0700
19

20

21

22

23              MICHAEL P. SNYDER, FCRR
                  Official Court Reporter
24              United States District Court
            219 South Dearborn Street, Room 1432
25                Chicago, Illinois 60604
                      (312) 435-5563

1  don't have any objections on these issues.

2  THE COURT: Okay.

3  MR. MINICHELLO: Your Honor, do you want an opening

4  statement or should we just proceed with Mr. Pearson, who is

10:09:15  5  going to be our only witness today?

6  THE COURT: I think you can just proceed.

7  MR. MINICHELLO: Your Honor, again as a matter of

8  procedure, I'm not conversant with how you like to have

9  exhibits handled. We are going to, we have the exhibits, and

10:09:48  10  we'll mark them as we go. Can we just show them to the witness

11  or would you like me to go to your clerk first?

12  THE COURT: There are no objections?

13  MR. MINICHELLO: No.

14  MR. KLOECKER: No objections, Your Honor.

10:09:56  15  THE COURT: All right. Well, let's just admit them.

16  Do they know which ones they are?

17  MR. MINICHELLO: Yes.

18  MR. FLOYD: We only have four planned exhibits right

19  now, Your Honor, so if it would be simpler, I can premark those

10:10:06  20  immediately and provide a copy over to you.

21  THE COURT: Why don't you just do that and there won't

22  be any issues.

23  Where is our witness?

24  MR. FLOYD: Yes. Your Honor, plaintiff calls as its

10:12:08  25  first witness Mr. Donald Pearson.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | THE COURT:  Okay.                                            |
|          | 2  | DONALD PEARSON, PLAINTIFF'S WITNESS, SWORN                   |
|          | 3  | THE COURT:  Please be seated, and spell your last           |
|          | 4  | name, please.                                               |
| 10:12:32 | 5  | THE WITNESS:  P-e-a-r-s-o-n.                                 |
|          | 6  | DIRECT EXAMINATION.                                          |
|          | 7  | BY MR. FLOYD:                                                |
|          | 8  | Q.  Mr. Pearson, good morning.                              |
|          | 9  | Would you please state your full name for the record.       |
| 10:12:42 | 10 | A.  Donald W. Pearson.                                       |
|          | 11 | Q.  And is it correct that you have been called, subpoenaed to |
|          | 12 | testify here today in this proceeding?                      |
|          | 13 | A.  Yes.                                                    |
|          | 14 | Q.  Okay.  Are you currently employed?                      |
| 10:12:54 | 15 | A.  I am.                                                   |
|          | 16 | Q.  Would you please state the name of your employer?       |
|          | 17 | A.  AMCOL International Corp..                              |
|          | 18 | Q.  And what is your position with AMCOL International Corp.? |
|          | 19 | A.  I am vice-president and chief financial officer.        |
| 10:13:12 | 20 | Q.  And generally speaking, what do your responsibilities for |
|          | 21 | that position entail?                                       |
|          | 22 | A.  Managing all financial affairs of the company, internal |
|          | 23 | controls, investor relations, banking, taxes, things like that. |
|          | 24 | Q.  So would it be correct to say that you are knowledgeable |
| 10:13:31 | 25 | about AMCOL's financial and business affairs?              |

1  A. Yes.

2  Q. Does AMCOL International Corporation have any subsidiaries

3  or affiliates?

4  A. Yes, AMCOL operates in approximately 25 countries. We've

10:13:47  5  got not quite a hundred subsidiaries around the world.

6  Q. Do those subsidiaries include Volclay International

7  Corporation and American Colloid Corporation?

8  A. Yes, they are both 100 percent owned subsidiaries.

9  Q. And do your responsibilities as CFO for AMCOL International

10:14:09  10  include any responsibilities for either Volclay or American

11  Colloid?

12  A. Yes.

13  Q. What do those responsibilities for the two subsidiaries

14  entail?

10:14:20  15  A. The same activities as I described before.

16  Q. Okay. Is it safe then and correct to say that you are

17  knowledgeable about the business and finances of AMCOL,

18  American Colloid and Volclay International?

19  A. Yes.

10:14:34  20  Q. Would you have any objection for simplicity's purpose if I

21  proceeded to refer to all three of those entities, American

22  Colloid, Volclay International and AMCOL, as either AMCOL or as

23  the garnishees?

24  A. That's fine.

10:14:51  25  Q. Okay. Does AMCOL have a business relationship with an

1  entity called Ashapura Minechem Limited which is the defendant

2  in this proceeding?

3  A. Yes.

4  Q. Does that business relationship involve an investment by

10:15:12  5  AMCOL in Ashapura?

6  A. Yes.

7  Q. Does AMCOL own stock in Ashapura?

8  A. Yes.

9  Q. What percentage of Ashapura is owned by AMCOL?

10:15:24  10  A. AMCOL currently owns approximately 19.9 percent.

11  Q. And when did AMCOL first purchase its interest or stock

12  ownership in Ashapura?

13  A. Approximately eight to ten years ago.

14  Q. And has the percentage of ownership or the number of shares

10:15:51  15  held by AMCOL in Ashapura remained constant throughout that

16  time?

17  A. No.

18  Q. When did it change?

19  A. In December 2009 we sold shares reducing our ownership from

10:16:08  20  approximately 21 percent to 19.9 percent.

21  Q. How many shares did AMCOL sell in Ashapura?

22  A. I believe it was around 950,000.

23  Q. Were those shares sold on a stock exchange or via a private

24  transaction?

10:16:26  25  A. It was via a broker on the open market.

1   agree it's hearsay at best.  It's also vague, and we get back

2   to the issue of yes, we went through the open market.

3        MS. SCHUCHARDT:  Can I have just one minute, Your

4   Honor?

01:21:18   5        (Pause.)

6   BY MS. SCHUCHARDT:

7   Q.  Finally, Mr. Pearson, if I can just draw your attention to

8   the chart next to me here.  It is also, there's a copy of it

9   under tab 7.  Are you familiar with the events that are

01:21:52  10   referenced on this chart?

11  A.  Yes.

12  Q.  How is it that you are familiar with them?

13  A.  I participated in the process.

14  Q.  Looking at the chart, does it accurately depict the dates

01:22:08  15  of the events that are referenced in it?

16  A.  Yes.

17  Q.  Is this chart up here on the board the same, appear to be

18  the same as the chart that's under your tab?

19  A.  Yes.

01:22:26  20  Q.  7?

21  A.  Yes.

22  Q.  All right.  Just another couple questions, Mr. Pearson.

23        You testified earlier when you were being questioned

24  by Armada that AMCOL would likely keep the funds if they were

01:22:41  25  not ordered to be paid to the plaintiff.  Do you recall saying

1  that?

2  A.  Yes.

3  Q.  Why is that?

4  A.  Mr. Chetan Shah is no longer seeking the funds, so we are

01:22:58    5  just holding them till this process is completed.  But he is no

6  longer claiming the excess.

7      MR. FLOYD:  Objection, Your Honor, on hearsay.  I

8  don't think it's helpful to us anyhow, but hearsay as far as

9  the intentions of Mr. Shah, whatever they may or may not be, or

01:23:22   10  Ashapura that Mr. Shah runs.

11     THE COURT:  Wait a minute.  Did I just understand you

12  to say that not only has this Mr. Shah never filed a claim in

13  here, but he agrees now that this isn't his money?  What are we

14  doing here?

01:23:45   15     MS. SCHUCHARDT:  I don't want to speak for the

16  witness, but --

17     THE WITNESS:  Your Honor, it is a interesting

18  situation.

19     THE COURT:  Yes, I suspect there might be some

01:23:57   20  legalities issue, but I don't know.  I'm no expert on --

21     THE WITNESS:  We had US and Indian counsel involved

22  every step of the way.  It was -- we were selling our shares --

23     Should I describe the situation?  I don't know what

24  you'd like me to say.

01:24:21   25     MR. FLOYD:  Your Honor, I would object if there hasn't

1 been a question.

2 THE COURT: Yes, I agree. Okay. Let's finish up.

3 BY MS. SCHUCHARDT:

4 Q. Can you describe the basis for your understanding that

01:24:37  5 Chetan is no longer making, has not sought the funds?

6 A. Through a series of other related or unrelated business

7 transactions, he's no longer expecting payment of that

8 excessive share purchase price.

9 Q. Throughout the time period mid-2009 to the present, has

01:25:11  10 there been any doubt in your mind as to who purchased AMCOL's

11 shares?

12 A. No.

13 Q. Who in your mind purchased those shares?

14 A. Chetan Shah.

01:25:20  15 MS. SCHUCHARDT: I have nothing further other than to

16 move for admission of Garnishees' Exhibits 1 through 7.

17 THE COURT: Fine, they are admitted.

18 (Said exhibits received in evidence.)

19 THE COURT: Okay.

01:25:36  20 MR. FLOYD: Your Honor, we would like the opportunity

21 for redirect.

22 THE COURT: Yes, go ahead.

23 MR. FLOYD: Your Honor, on a housekeeping matter, and

24 I'm not sure it was fully covered prior to the testimony,

01:25:57  25 regarding Garnishees' Exhibit No. 7, we did agree, stipulate to

1  its being utilized as a demonstrative, but not to the

2  evidentiary value or to --

3  THE COURT:  Well, I wasn't assuming that you were

4  agreeing with anything in it.  I mean, you may not be, I don't

01:26:16  5  know, but --

6  REDIRECT EXAMINATION

7  BY MR. FLOYD:

8  Q.  To start with an item that you just touched on, Mr.

9  Pearson, you said that pursuant, and I'm paraphrasing you here,

01:26:28  10  but pursuant to a series of related transactions, Mr. Chetan

11  Shah, who you contend is, was the counterparty in this

12  transaction, is no longer seeking the excess sale proceeds.

13  Did any of those related transactions involve Ashapura

14  Minechem Limited?

01:26:49  15  A.  I think I corrected myself to say unrelated.

16  Q.  Unrelated?  Did any of those unrelated transactions involve

17  Ashapura Minechem Limited?

18  A.  I don't think they did.

19  Q.  Do you know anything about the nature of those

01:27:09  20  transactions?  Were they transactions involving AMCOL, Volclay

21  and/or American Colloid Corporation and Ashapura, its owners or

22  its subsidiaries or affiliates?

23  A.  Yes, it was AANV.

24  Q.  And the joint venturers, the Indian joint venturer in AANV,

01:27:32  25  which is, is it correct that AANV is the Belgium joint venture

1 | between Ashapura and an AMCOL affiliate?

2 | A. Yes.

3 | Q. And the Indian, is it correct that the Indian joint

4 | venturer in AANV is Ashapura Minechem Limited?

01:27:52   5 | A. It is.

6 | Q. So what was the nature of the transaction that involved

7 | AANV which somehow extinguished Chetan Shah's purported

8 | interest?

9 | A. We had written off this investment in the fourth quarter of

01:28:19   10 | 2010, and we were desirous to legally get out of our 50 percent

11 | ownership as well of AANV, so we entered into a arrangement to

12 | sell our 50 percent to Ashapura, and on some of the notes that

13 | were due us we reduced the note values.

14 | Q. Does that then refer to the, ballpark number, $109,000

01:29:00   15 | note?

16 | A. No.

17 | Q. That note, though, was written off -- is it correct that

18 | that note was also written off in December 2010?

19 | A. It may have been. I'm not, I can't recall if it was. I

01:29:15   20 | wouldn't be surprised because it's probably not collectible.

21 | Q. So would it be correct to say that Chetan Shah's purported

22 | supposed interest in the stock sale transaction was satisfied

23 | or extinguished because of a related, because of a separate

24 | transaction in which Ashapura Minechem Limited was the 50

01:30:28   25 | percent joint venturer in the counterparty to this separate

1    transaction?

2    A.  Yes.

3    Q.  Is it correct to say that then there is linkage, if you

4    will, between a benefit flowing to Ashapura Minechem Limited

01:30:47   5    and Chetan Shah's interest or purported interest in the excess

6    sale transaction being satisfied or extinguished?

7    A.  Not different from the original intent of the arrangement

8    which was to have that debt at AANV ultimately reduced or paid

9    down by the excess.  So we essentially got to the same end

01:31:16   10   result.

11   Q.  So the end result, you are saying that the end result was

12   to have a debt that was owed by AANV reduced or paid down,

13   correct?

14   A.  Yes.

01:31:26   15   Q.  And Ashapura Minechem Limited is a 50 percent joint

16   venturer in AANV, correct?

17   A.  Yes.

18   Q.  So would the reduction of a debt owed by AANV to any third

19   party provide a direct benefit to Ashapura Minechem?

01:31:52   20   A.  To the extent it was ever really paid, yes.  We had written

21   a receivables off, so we are not expecting any collection.

22   Q.  Okay.  Do you have any document demonstrating that Chetan

23   Shah purchased the 950,000 shares that were sold via the Indian

24   stock exchange?

01:32:21   25   A.  No.  Our broker probably would.